645 A.2d 947

**DELAWARE VALLEY SCRAP COMPANY, INC. and Jack Snyder, Petitioners,**

v.

**DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Jan. 31, 1994.

Decided July 12, 1994.

Karen L. Saraco, for petitioners.

Kenneth A. Gelburd, Deputy Regional Chief, for respondent.

Before COLINS and FRIEDMAN, JJ., and LORD, Senior Judge.

COLINS, Judge.

Delaware Valley Scrap Company, Inc., and Jack Snyder (collectively, Appellants) petition for review of an August 5, 1993 order of the Environmental Hearing Board (Board) affirming the Department of Environmental Resources' (Department) denial of their appeals from an order denying their permit application to operate a municipal waste processing facility and imposing a civil penalty assessment against them.

Appellants operate a baler and a car crusher at a facility in Bristol Township, Bucks County. On January 14, 1988, Appellants submitted to the Department an application for a solid waste management permit to operate a municipal waste processing facility. The Department denied this permit application on October 4, 1988, which decision was never appealed. On November 10, 1988, December 12, 1988, and January 17, 1989, a waste management specialist from the Department conducted inspections of Appellants' facility. Between the second and third of these inspections, on December 20, 1988, Appellants submitted a second application for a solid waste management permit.

On May 31, 1989, the Department issued to Appellants an order denying their permit application and imposing a civil penalty assessment against them for having violated, on the aforementioned three days of inspection, the following: Sections 301, 307, 316, 401, 402 and 611 of The Clean Streams Law (CSL) [1], Sections 201(a), 501(a), 610(1), (2), and (4) of the Solid Waste Management Act (SWMA) [2], and 25 Pa.Code § 271.101. The order further directed Appellants to immediately stop processing solid waste in the baler, to immediately remove and dispose of municipal waste at the facility, and to

[1]. Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1–691.1001.

[2]. Act of July 7, 1980, P.L. 380, *as amended* 35 P.S. §§ 6018.101–6018.1003.

stop operating the car crusher until the Department determined that no oil was escaping into the soil.

After considering Appellants' consolidated appeals, the Board, on August 5, 1993, issued an adjudication and order affirming the Department's cleanup order, permit denial, and civil penalty assessment. Appellants filed a petition for review of the Board's order. "This Court's scope of review from a determination of an appeal from the Environmental Hearing Board is limited to whether constitutional rights were violated, whether an error of law was committed or whether necessary findings of fact were supported by substantial evidence." *Bichler v. Department of Environmental Resources*, 144 Pa.Commonwealth Ct. 55, 58–59 n. 3, 600 A.2d 686, 688 n. 3 (1991).

Appellants argue the Board erred in affirming the Department's denial of their request for a solid waste permit to operate their baling operation because of their aforementioned noncompliance. They contend that had the Department considered their initial January 14, 1988 permit application in a timely fashion, they would have been in compliance with the Department's trash transfer facility regulations which were adopted prior to April 9, 1988. Appellants further maintain that they tried in good faith to obtain a permit, as shown by their second permit application, which the Department also denied, because, although it complied in all other respects, it lacked a landlord signed consent-to-entry form. It is averred by Appellants that denial of this second permit application constituted an abuse of discretion by the Department and placed Appellants, in conducting their business operations, in the inevitable position of continuing to violate both statutory and Departmental requirements. Finally, Appellants argue the Board erred in affirming the $19,500 civil penalty assessed against them after having initially determined that the Department's method of calculating this penalty was incorrect.

After review of the record, we find substantial evidence therein to support the Board's affirmance of the Department's findings that Appellants: (1) continued to operate their waste

transfer facility and car crushing operations after a Department inspector advised them they needed a permit for these activities; (2) only ceased these operations after being expressly ordered by the Department to do so; and (3) were in fact in violation of the SWMA at the time the Department denied their permit application. In this regard, we note the following relevant testimony elicited from appellant Jack Snyder, appellants' expert witness, Jerry Naples, and the Department's compliance specialist, John Minihan, during the September 12, 1990 hearing before the Board:

[Jack Snyder]

Q. What is the origin of the materials that come into the processing facility as opposed to the car crusher? Where do those materials come from?

A. They come from commercial entities.

Q. Without asking you specific names, I assume you prefer not to give out a customer list, but just what kind of entities are you talking about?

A. Such as Toys Are Us, food stores, clothing stores, some industrial plants, some private residences.

Q. And as far as you know, the materials that come to that processing facility at the Delaware Valley Scrap site, those materials are not store separated, right?

A. That's correct. Strike that. I'm sorry, it's not entirely true. There are materials that are store separated and what you are referring to is not store separated.

. . . .

Q. With respect to collecting liquids that would drip out of the car crushing operation, isn't it true that items to collect such liquids were only installed at the operation after the Department issued its Order?

A. That's correct.

Q. You testified earlier this morning that such liquid drippings were being 'washed off the premises' during period[s] of rain, correct?

A. Not recently, but previously.

. . . .

Q. And the direction in which they [the drippings] washed off the premises was towards the railroad right-of-way, right?

. . . .

A. It would escape the yard.

Q. In which direction?

. . . .

With respect to your statement that the materials are washing easterly, that is, is it not, towards the railroad right-of-way?

A. That's correct.

. . . .

Q. Are you physically present on the site on pretty much a daily basis, or at a minimum once a week?

A. Yes.

Q. And you observed the conditions and what was physically going on day by day during the period 1987 to date?

A. I do, yes.

Q. And your authority over the operation was such that you said subject to whatever disputes you might have over contract and so forth, but if you said, 'Let's stop taking in stuff for the processing facility unless and until we get a permit,' your word would have stood, correct, you had the authority to make that decision?

A. That's correct.

Q. But that didn't happen until about a week or so ago, right? You didn't stop, you didn't direct the processing facility operation to stop?

. . . .

A. Yes.

[Appellants' Expert]

Q. Mr. Naples.... What is your position with REACT besides being a principal?

A. I develop projects as a Project Manager and Project Lead in cases.

Q. What does REACT do as a specialty?

A. We provide emergency response to oil spills and site remediation, including hydrogeologic investigations, assessments and remediations.

. . . .

Q. You testified, Mr. Naples, that there was oil quote 'adjacent to the fence' unquote, when you had been out to the site and observed it yourself, is that correct?

. . . .

A. We did see oil contaminated soil. I might refer to oily soil as oil generically-yes, there was oil contaminated soil outside the fence as well as inside the fence.

[The Department's compliance specialist, John Minihan]

Q. How did you take into account the specific facts on those criteria, what were the facts that you were considering on each of those points?

A. The fact that there was municipal waste that was of a variety of components from cardboard to paper to whatever [was] inside of it, being placed outside open to the environment with no roof, as far as I could tell, no containment underneath it, nothing to catch any drainage from it or anything like that.... The other part was the fact that he was told he needed a permit for processing. He had not ceased operation of the processing. And he continued to operate.

Q. Which criterion did that fall under?

A. The fact that he was aware of and continued to operate went underneath the willfulness factor. The size of the pile, what the constituents of that pile were, went into the severity. The threat went into the severity.

■ With respect to the $19,500 civil penalty assessed against Appellants ($6,500 for repeated violations on each of the following dates, November 10, 1988, December 12, 1988, and January 17, 1989, respectively), the record indicates that Appellants continually failed, until just weeks prior to the hearing, to comply with a Department order to stop storing waste and operating their solid waste processing facility. In assessing the willfulness of Appellants' noncompliance, John Minihan, the Department's compliance specialist, noted that although as early as 1987, Appellants knew a permit for their baling activity was required, they continued to operate without one. In *Booher v. Department of Environmental Resources,* 149 Pa.Commonwealth Ct. 48, 612 A.2d 1098 (1992), Appellants' continued violation of the SWMA was deemed proper cause for a finding of reckless behavior, warranting a $6,000 penalty pursuant to Department penalty assessment guidelines, which this Court summarized as follows:

Pursuant to Section 605 of the SWMA, 35 P.S. 6018.605, DER may assess a civil penalty for every violation of the SWMA, whether the violation was willful or negligent. Under DER guidelines a civil penalty assessment for negligent behavior falls within a range from $1,500 to $10,000. F.F. No. 29; R.R. at 11a. DER guidelines for reckless disregard of its regulations require an assessment in the range from $6,000 to $17,500. F.F. No. 32; R.R. at 12a.

*Id.* at 58, 612 A.2d at 1103. Applying this rationale to the case before us, the activities of the present Appellants could reasonably be deemed by the Department as manifesting reckless disregard of and noncompliance with Department and statutory regulations on three separate inspection dates. Moreover, for each of the aforementioned dates of noncompliance, the Department has authority to impose a penalty, and the penalty amount of $6,500 that was assessed against Appellants is, in fact, at the low end of the Department's $6,000 to $17,500 reckless disregard discretionary range. Further, the penalty amount assessed by the compliance specialist was, according to the record, also based upon: (1) the size of Appellants' operation; (2) the composition of the waste processed; and (3)

the actual and potential threat Appellants' operation posed to the environment, specifically that the waste was comprised of various components, was exposed to the elements, and did not appear to be separated from the ground's surface.

Finally, we note that "a reviewing court may interfere in an agency decision only when there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Starr v. Department of Environmental Resources*, 147 Pa.Commonwealth Ct. 196, 201, 607 A.2d 321, 323 (1992). The present record does not indicate any manifest abuse of discretion or arbitrary action by the Department with respect to Appellants' unarguable statutory and regulatory violations.

Accordingly, the Board's order is affirmed.

## ORDER

AND NOW, this 12th day of July, 1994, the order of the Environmental Hearing Board dated August 5, 1993 in the above-captioned matter is affirmed.